Good morning. We have listed for argument this morning the matter of Rajbir v. United States of America. We have an allocation of time among counsel for the petitioner. Ms. Joseph, you're first to go, I believe. May it please the court, my name is Amy Joseph, and I represent petitioner Mr. Ravida Lawrence-Ragbir. I'd like to reserve three minutes of rebuttal for my co-counsel, Daniela Lugas. Thank you, Your Honor. Mr. Ragbir, who is here in the courtroom today with his wife, Amy Gottlieb, family, and community, faces deportation as the result of criminal proceedings rendered invalid because of several fundamental flaws. The district court made several legal errors in denying his quorum nobis petition, and I'd like to If I could stop you right there, because you used a word, an important word for purposes of our analysis, under a quorum nobis writ that is fundamental. Has there been, either from the Supreme Court or a consensus or majority of courts of appeals, a broad definition or a narrow definition or some kind of principle as to what constitutes a fundamental error? Yes, Your Honor. So if I could answer that with regards to the two sets of claims that we're bringing forth. So ineffective assistance of counsel, of course, affects a defendant's Sixth Amendment rights, and for that reason would be fundamental. Let me interrupt you right there. Do you have any cases from the Third Circuit that say, for purposes of quorum nobis, ineffective assistance of counsel is a fundamental error? Your Honor, we do. I'm sorry, I can't think of one right now off the top of my head. That would be a really important case, because you're arguing for fundamental. We're bound to follow precedent. The Chief wants to know if it's narrow or broad. And you aren't able to, on the spot, name one case that has found fundamental error, or ineffective assistance of counsel is fundamental error for purposes of quorum nobis. Well, Your Honor, of course the case J. Lee is very applicable to this situation, and of course the Supreme Court case J. Lee, because there Chief Justice Roberts found that there was ineffective assistance of counsel where counsel, like Ms. Lee here, advised the defendant in that case to forego a critical proceeding. Let's return to the question that Schipps asked you, which directed you toward Third Circuit authority. And I'm not aware myself of a Third Circuit presidential decision which declares ineffective assistance to be a fundamental error. However, we do have a case, United States v. Woods from 1993, that refers to fundamental as a defect which inherently results in a complete miscarriage of justice. Yes, Your Honor. So I suppose that you would rely, at least upon that authority, for saying that ineffectiveness that in fact prejudices a defendant constitutes a miscarriage of justice. Of course. But you would be required to take that step in the absence of presidential authority within this circuit. Yes, Your Honor. We absolutely agree that there has been a miscarriage of justice here, because, Your Honor, Mr. Rugbeer communicated to his counsel his paramount concern, which was deportation. And we understand that from the record. Right now, I'd like to try to get some basic legal principles established, because, number one, I think we can all agree that quorum nobis is an extraordinary writ. Absolutely. We've been told that by the Supreme Court. And I think we can all agree that there is a paucity of presidential authority within the Third Circuit dealing with quorum nobis. So as we look at what is out there, is there any, first of all, opinion that sets out those circumstances that must be shown by a petitioner in Mr. Rugbeer's position that would permit him to avail himself of a petition for quorum nobis? What are the circumstances, given its extraordinary nature, that would allow such a petition? Well, Your Honor, so the first is obviously a fundamental error. In this case, the fundamental error would be the misadvice that Ms. Lee gave to Mr. Rugbeer. There are two pieces of misadvice here. The first was that she told him that conviction leads to deportation, and that is objectively Aren't there sworn affidavits that allege failure to advise? Well, Your Honor, what she did was fail to advise him, fail to say Are you asking if there are sworn affidavits in the record that allege failure to advise? Not as that term is understood in Padilla. In Padilla, a failure to advise is an attorney saying, I don't know, or an attorney saying nothing. And that is emphatically not what Ms. Lee did. So your client never said that Ms. Lee failed to advise about the immigration consequences of the guilty plea? Excuse me, of the agreement to the amount of loss at sentencing? To the extent that a phrase like failure to advise was used, Your Honor, it is not mutually exclusive here in terms of misadvice, particularly because she stopped four words in out of a 15-word statute. And she gave him the misadvice that it was conviction that leads to deportation. And there are several cases, including cases in the Third Circuit, where conviction of fraud does not lead to deportation. I understand tactically why you are focusing on advice that was given or not given. But let me take you to the issue of delay. And ask you that if this court were to determine that the utilization by the petitioner here of the administrative process over a period of time, in the absence of any attempt to pursue a collateral attack, took too long, we don't have to reach any of the other issues, do we? Well, actually, Your Honor, in Cariola, which is a Third Circuit case, all the way from the 60s, for decades now, this has been good law. In that case, the petitioner waited 24 years. The court found that there was not a sound reasons problem. And the court said that when there is a denial of a fundamental right at issue, the passage of time will not preclude relief. Was there anything that precluded the petitioner from simultaneously pursuing a collateral attack here? Well, Your Honor, if you're referring to the period that the government alleges, which is the period of 2008, when he was out of immigration detention. Well, let me first ask you what you maintain is the relevant time period here. Of course, Your Honor, that is 2006, when Mr. Rugbier first understood at his immigration proceedings that he was removable because of the loss issue. Of course, before that, he had consulted with a criminal attorney while he was in criminal custody, and he had been told that there was nothing to be done. Now, wait a minute. He took a direct appeal for his conviction to this court. With the new counsel. With new counsel, not trial counsel. And as I understand the record, never raised a single issue relevant to this attack. Am I correct? You are correct, Your Honor. It is because it is very much because Miss Lee told him that it was the conviction that made him deportable. It was not until he was in immigration proceedings that he understood that it was the loss. After when was he released? I know he was convicted in 2000. He then, as I recall, the following year, took his appeal. The conviction was affirmed. He was released in what, 2004? Your Honor, respectfully, he was in house arrest between 2001 and 2004. He was in criminal custody until 2006. You say he was on house arrest. During the pendency of the appeal, he was on house arrest. So, he essentially had his freedom subject to restrictions. And could, during that period of time, have consulted counsel. Spent time, as so many convicted individuals do, on their cases. And yet, nothing is pursued with respect to collateral attack. There's no 2255 file. That's right, Your Honor. Never has been a 2255. It only could have been raised during the statutory period following conviction. Let me ask you this. And I understand because I've been asking you questions that are, I think, essentially legal in nature. And admittedly, this is a policy question. Sure. But, isn't it at least understandable to you that this court, this panel, could be concerned, justifiably concerned, for policy reasons, about someone in the petitioner's position here, merely hewing to the path of administrative attack, or administrative appeals, for years, as is, in fact, the case here. And not going to a form of collateral attack, which really Quorum Novus is here, until the last moment. In fact, from the standpoint of this judge, in a kind of Hail Mary pass. Well, Your Honor, to be clear, we believe that it would actually be in the court's advantage to make sure that people pursue their administrative remedies. Of course, for Quorum Novus, a requirement is a collateral consequence. It would make sense for people to directly attack that collateral consequence itself, and exhaust that to the extent possible. Of course, it rhymes. The relief that you want is to, is ultimately, if we talk about the process-based relief, is to have a non-deportable sentence, a non-deportable fine, a fine of under $10,000, as I understand it. Could I make sure, Your Honor, just to be clear, we wanted to be clear also that the laws that we're talking about is the laws tied to conviction. That is what is necessary for immigration purposes. Mislead the district court and the government, get it wrong. Okay, let me finish my question. Sorry, Your Honor. Ultimately, what you want is for this sentence to make him non-deportable, make your client non-deportable. But he's had, you could say the collateral consequences are to the judgment, but the relief has always been the same. You could have got that relief through direct appeal to say $10,000. It should be under $10,000, not $350 and $1. You could have possibly, if you would have wanted to, got that through a habeas petition, if you were to have filed one, could have filed the quorum nobis even earlier. It seems that quorum nobis is a last resort when this same relief was available through other mechanisms, is a bit of a stretch in an unprecedented way. And so I guess my bottom-line question is, why under these circumstances should we do something unprecedented? Your Honor, may I say I'm out of time? Yes, yes, please. Okay. As Judge Becker used to say, you're on our time now. So just to be clear, we went through there. It's not unprecedented in the sense that the Second and Ninth Circuits have found that administrative remedies constitute sound reasons. Second of all, the very reason that Mr. Rugbear could not have brought this claim earlier is because the fatical hearing,  Is there any reason, excuse me, is there any way that what is necessary for the petitioner to prevail here could have been obtained through the immigration administrative process? That is an attack, a successful attack upon the sentence. The answer is no. And the reason, Your Honor, is because Mr. Rugbear did not have access to these key title searches, appraisals, deeds that the government has had in its possession since they first mounted attack. This is the very evidence Mr. Rugbear would have put to the test in a fatical hearing. And even assuming that that was forewent, that was the very evidence that was necessary for the loss negotiations. I mean, we know from both Ms. Lee herself, from her sentencing memo, she asserts that all of the property was secured. And then when we go to AUSA Dow's memo, we see that a lot of these loans are the face value of the loans. And the key thing that we needed was to make sure that in the stipulation, there was a very simple solution. The stipulation as it stands refers to 16 loans, including eight loans that were not introduced at trial, that were not even proven to be fraudulent in any manner. And it would have been the government's burden to prove that, to prove that amount of loss and their connection to the conduct at issue at a fatical hearing. And because Mr. Rugbear has no access to these kinds of documents, they were in either HFC's possession or the government's, and certainly as a respondent in immigration proceedings, he had no way of getting these documents from anybody. What he needed to have happen was his attorney to demand those documents, specifically with the purpose of making sure that the loss tied to indicted conduct and not the overall loss, because that is not the question, Your Honors. The question is not the overall loss. There were five properties subject to the charges in the indictment, were there not? There were five indicted properties. That's correct, Your Honor. What's the likelihood of five indicted properties not leading to a loss in excess of $10,000? $10,000 apiece. Well, we think that there is, as Strickland prejudice requires, a probability sufficient to undermine confidence in the outcome. And the reason, Your Honor, is several reasons. As, again, Ms. Lee asserted in her sentencing memo, she said that all of those properties were secured. However, the amount in the stipulation do not reflect collateral and they don't reflect repayments. So we have no idea. Again, these are mortgages. These are not simply regular loans. There is something presumably backing them. And so because it would have been the government's burden to prove that, we certainly think that at the very least, if what the government wanted was a restitution order of $350,000, if what they wanted was a certain prison sentence, they could have had that. Actually, the government, I believe, took a position, at least initially, the prosecutor did, that the actual loss here was in the neighborhood of a million dollars. Respectfully, Your Honor, those were simply face values of the loaners. I understand that, but that was an initial position, and eventually the parties through stipulation came to rest on the $350,000. Yes, Your Honor. And, of course, Mr. – I'm so sorry, Judge, did you have a question? No, I do, but go ahead. Please finish. Just to say that because what is relevant for immigration purposes, which is clear from the face of the statute, if Ms. Lee indeed looked at the statute, then it would have been clear that aggravated felonies are tied to convictions. And so the loss tied to the amount of conviction is what we're looking at. If the stipulation merely would have said that this $350,000 or $400,000 loss, Mr. Rugbeer prioritized his deportation, he would have agreed to a higher amount of restitution or loss for sentencing purposes. What he needed was a simple sentence in the stipulation stating that the loss, that $350,000 loss was tied to these unindicted loans or relevant conduct that would not count for immigration purposes. I'm sorry, Your Honor. Just so I'm clear, what relief you're seeking, you're not seeking a new trial, correct? Are you seeking a new sentencing hearing? We're seeking the FATICO hearing, Your Honor. I'm sorry, you're seeking? A FATICO hearing. A FATICO hearing, okay. And that, of course, is a procedure at which this evidence would have been put to adversarial testing that Mr. Rugbeer could have cross-examined witnesses and that there could have been factual findings. It is because this is a critical proceeding that J. Lee applies here, that J. Lee prejudice dictates what the prejudice standard is, the prejudice standard for this misadvice that he forego the FATICO hearing and instead essentially stipulate to his deportation. That misadvice led to a forfeiture of a critical proceeding. And to be clear, although the government – We would put proof that the loss tied to the counts of conviction. Okay. And one of the counts of conviction is a conspiracy count, correct? Yes, Your Honor. Okay. So you're going to try to prove that the loss – separate out the individual counts for a minute. You're going to try to prove that the loss in the conspiracy count was under $10,000. Yes, Your Honor. What if it turns out that the proof is that the loss in the conspiracy count is $1.5 million? Does he then get sentenced for a loss of $1.5 million rather than the sentence for $350,000? Yes, Your Honor. And to be – So he would run the risk of going – I mean, you know, loss amount really drives the sentencing guidelines. Yes. So you're suggesting that you're willing to put your client at risk of – and I don't even know how that would work. I don't know how he could get – I mean, wouldn't there be a double jeopardy bar to that? You're suggesting he might go to jail for another 5 to 10 years, whatever the guidelines indicate that that additional $1.2 million in loss might be? Well, Your Honor, yes. And what we're saying here also critically ties into Jay Lee. Jay Lee, Your Honor, the defendant himself, was facing incredible odds. And he – I mean, Chief Justice Roberts decided that he had the right to decide. If he wanted to take that chance, that was what he was entitled to do. And the fact that his attorney misadvised him and that misadvice led to a forfeiture of a proceeding, the question here, the prejudice question here, is whether he would have opted to have that proceeding. And, yes, Your Honor, everything in the evidence suggests that Mr. Rugbear would have done that. He went to trial. He refused two guilty pleas. He chose to stay in immigration detention. Well, I wasn't asking about what he would have done. I'm trying to find out what happens next if you get the relief you seek. And if I understand what you're saying, you're saying that his opportunity to show that the loss is under $10,000 also brings with it the chance that it would be proved that the loss is over $1 million. And you believe he would then be sent back to jail and he would have to be sentenced according with the correct loss, i.e., the $1 million loss, rather than the stipulated loss, which was much lower of $350,000. That's your position? That's our position, Your Honor. And, of course, it's the loss tied to the Council of Convention, yes. Thank you very much. We will have your colleague back on rebuttal. Thank you, Your Honor. Mr. Coyne. Good morning, Your Honors. May it please the Court. Mark Coyne for the United States, and thank you for the privilege of being here. Let me start off with what I believe I heard to be a concession. If they are only seeking a fatigo hearing, that is, a resentencing hearing, that means they have now just waived all of their challenges to the conviction. And if that is true, this Court need not even address any of their claims of jury instructional error or ineffective assistance of counsel at trial. Those claims fail for multiple reasons, as we have laid out in our responsive brief. Does the root of quorum nobis apply to sentencing? We obviously know it applies to convictions, but does it apply to sentencing? I think there is no precedent from this Court saying that it does. I'm not aware of any precedent from the Supreme Court saying that it necessarily does. And with respect to the Supreme Court's own guidance as to the strict standard for quorum nobis, the United States Videnedo, D-E-N-E-D-O, talks about quorum nobis in the very context of bad advice to plead guilty. The other problem here is all of their prejudice cases that they cite, all prejudice cases in the context of bad advice or allegedly bad advice to plead guilty and thereby waive that fundamental bulwark against that protects defendants and secures their liberty, that is, the right to confront their accusers, the right to a jury trial in front of their peers, the requirement that the government prove guilt beyond a reasonable doubt, all of those protections. That's what Jay Lee, that's what Hilby Lockhart, that's what Padilla itself, that's what all of these cases are talking about, that kind of total deprivation of an entire judicial proceeding, not a stipulation to a fact in an otherwise hotly contested sentencing proceeding. And that's their fundamental problem on the, let's call it the sentencing claim, the claims of ineffective assistance of counsel. Well, whether or not those other claims have been waived, and of course the petitioner here was afforded that panoply of rights you've just recited. He went to trial and had the benefits of trial and confrontation of witnesses and so forth. But we need not reach the other issues here were we to focus solely on the issue of delay and found that it was inordinate or unsupportable or inexplicable, what have you, right? I agree, which is why we led with that point in our brief. And I assume, though, that you would concede that there is not a substantial body of law within the Third Circuit addressing petitions seeking quorum nobis. Not substantial, but there are several precedential opinions. And so most recently Mendoza. Yeah, well, I was about to get to Mendoza because, first of all, both the Second and the Ninth Circuits have said that diligent pursuit of administrative factors is at least one factor that can be supporting a determination that there were sound reasons for delay, right? Yes, a factor, although even the Ninth Circuit has acknowledged in its later case, Rydell, that it's certainly not outcome determinative. And Rydell even distinguished the prior Ninth Circuit case in question, which I believe you're referring to as Kwan, on that very basis. Yes, Judge Fletcher. Judge Fletcher wrote Kwan, and a later decision, Rydell, found undue delay, in part because the defendant could have easily brought the claim in question in a 2255 proceeding. And I'm not suggesting that they've indicated diligent pursuit is dispositive, but with respect to Mendoza, though, and perhaps this is what you were about to suggest, Mendoza, and in fact no case I'm aware of, has set, or could set, any specific time period that is excusable or inordinate. But Mendoza does cabin the time period with its language some, does it not? Well, I believe the time period there was four years, and that was simply too long. And that was an instance where the law was supposedly unclear, and that wasn't sufficient to justify the delay in bringing the claim through any mechanism. So when, so you're right, you led with delay is your first brief. When would you concede, if you would, that there wasn't a delay? If Mr. Ragbeer would have filed for quorum nobis on X date, you would say, okay, that's fine. That's good. That seems to make sense. Do you have X date or X date range in your head? Because it would be nice to have more benchmarks in this area, and since you led with it, it makes sense to look to you to suggest a benchmark. All with the overarching caveat that whatever the benchmark here, whatever the benchmark this court were to adopt is, the delay here was far too long. And because we're dealing with, again, assuming the challenges of the conviction are still in play and have not been waived, that delay goes all the way back to the trial itself, effectively. And we understand that we're dealing with this case and with the facts and the procedure of this case. But do you believe it would be possible for this court to lay down, if not a time period, some kind of benchmark? Or must we address all cases, at least of this ilk, on a case-by-case basis, based on the facts and the procedure that appears to us over a period of time? Certainly as a prosecutor, but as an advocate, I prefer rules, not sort of fuzzy standards. So it would be nice to have very clear rules. In the abstract, I would not disagree with that in the least. This seems like the type of extraordinary writ that's not susceptible to those kind of clear rules. Is that the case? I was about to get to that. And so the precedent that we do have, both from the Supreme Court and the Third Circuit, acknowledge that you look at a lot of different circumstances in determining the amount of undue delay. Let's take the Cariola case that my good friend cited. I don't think it was mentioned in any of the briefs, but I'm now drawing on my recollection. I believe Cariola involved a defendant who thought he had pled guilty to a misdemeanor and therefore would have suffered none of the consequences of a felony conviction and only many, many, many, many years later realized that he had a felony conviction. And Cariola is a much older case. Cariola is sort of, you have to view that through the prism of everything that this Court has said since then about delay and Coram Novus generally and also Donito, what the Supreme Court itself said in Donito, about one of the factors being what are your excuses for the delay. And so I do want to focus on one very key factual matter here, which is mentioned in the brief as well. In the immigration proceedings on June 7, 2006, you can find this reference at JA 912, immigration counsel in Mr. Ragbir's presence informed the immigration judge that a criminal defense lawyer would be retained to vacate the conviction. And so for sure the delay period starts there on the claim of ineffective assistance of counsel. But that did not, according to the record, that did not happen. It never happened. Let me return you, though, to the notion of a benchmark or the notion of some kind of rules. Have you, do I understand you to have suggested at least one factor that might be employed in this case and in others? Do I understand that the government's arguing that a failure to seek 2255 relief should act as some kind of a procedural default rule? I think at a minimum it is a circumstance that this court can and should consider. Which takes us back into the fact-bound nature. I understand that, Your Honor. But again, and we've cited chapter and verse multiple decisions from other circuit courts denying finding undue delay in part because the very claims were available through 22, could have been raised during 2255, and the petitioner never sought it. Or sought the 2255 remedy, but for whatever reason did not bring these particular claims, these new claims. And I add that that seems to me to be a necessary consequence of what quorum nobis is. It's an extraordinary writ that's supposed to step in when there's no other remedy. But there were other remedies here much earlier in time. But there aren't now. There aren't now, but that's not the government's fault. That's not this court's fault. All right. Well, what if you lose on the timeliness issue? Why shouldn't we follow Castro, the Fifth Circuit opinion? That seems to support Mr. Ragbir's argument, does it not? Judge, forgive me, but I'm now not recollecting Castro itself. The JRAD case? Okay, back when there were still judicial, when there was that provision, Yeah, the client was not advised of his opportunity to get a JRAD. The Fifth Circuit reversed the district court's denial of the writ, saying, you know. For starters, that was a very clear, at least potential, remedy available under the immigration laws at the time. This court had never adopted, next reason why, this court had never adopted it. But it was discretionary with the district judge, though. You had to ask for the JRAD. It wasn't guaranteed. And here there might be a stronger argument because we know from what the law says, if the loss amount, I think you have to agree, if the loss amount is under $10,000, then he's not removable. So let me address that as well, because I think this gets into the facts and also the nature of the claim. For starters, Judge McNulty found as a factual matter that there was no affirmative misadvice found as a factual matter. The advice was not, if you get convicted, you're absolutely going to get deported. Rather, found that the advice given as a factual matter was this. If you are convicted, you very likely will be deported. He also found, as a matter of law, that was reasonable advice under the circumstances. Right, but that's the advice to actually take a shot and go to trial rather than pleading guilty. That doesn't shed any light on agreeing to the loss amount. But then it goes to the next step, which is then the agreeing to the loss amount, the advice, advising the client, advising Mr. Redbeard to agree to a loss amount of $350,000 rather than keep fighting a loss amount, which is going to be doomed to fail and could have resulted in a substantially higher prison sentence. That advice is viewed to the prism of the entirety of the trial record. So let me give you an example of the trial record. One of the mortgage properties that is the subject of the count of conviction was, in truth, owned by a woman and her daughter as joint tenants, but not according to the loan documents. The loan documents, the mortgage loan that purported to be secured, that was purportedly secured by this property, was relying upon, that mortgage loan was relying upon a forged deed that vested sole title in the mother. The lender could never have possibly foreclosed on that loan. The loan, the face value of that loan was about $100,000, and we've cited this in our brief, and it's in the record of the evidentiary hearing that Judge Minolti conducted. The loss would have exceeded $90,000 on just that loan because, again, there was a fundamental defect, forgive me for using the term fundamental in this context, but there was a very fundamental, from a real estate perspective, a fundamental defect in the chain of title that would have thrown a huge roadblock in any effort to try to foreclose on that loan. And so just on that one loan alone, we're talking about at least a $90,000 loss. I think my good friends are also fundamentally mistaken about restitution. The restitution statute itself says that loss has to be tied, has to be proximately caused by the conduct of conviction. There's a conspiracy count here. Our allegation was that every single loan he originated, that he admitted to when he confessed, not once, not twice, but three times, that all of those loans were originated fraudulently. And so although my predecessor, AUSA Dow, now a Superior Court judge in New Jersey, and a phenomenal AUSA, if there ever was one, if anything, she was taking a lenient position on what loss could have been. She could have, had she wanted to, I could have, were there to be a resentencing hearing, and I don't believe a resentencing hearing is even remotely warranted on these facts. Well, do you agree with Ms. Joseph if there were a hearing that he would be in jeopardy of a new sentence that would subject him to a much longer term of years if you were to prove a higher loss amount? I haven't run this to the ground, but it sure looks like a double jeopardy problem. What's giving me pause is this. There's that exception to double jeopardy that says when you place yourself in continuing jeopardy, then really you lose the benefit of the double jeopardy protection. I've never really drawn that. But this case is, he served his sentence. He has. The case is over. The criminal case is over. We thought it was over in 2004 when the Supreme Court, or 2002 when the Supreme Court denied cert, and certainly when he didn't file a 2255 motion at any time raising these claims. But even in spite of that, you think there's a chance he could be subjected to a new term of years in prison? I don't know the answer to that question because I haven't drilled down to the double jeopardy issue. Does it matter in terms of your position in this case? It certainly doesn't because he's not entitled to coram nobis relief for multiple reasons as we've laid out. And again, really they're hanging their entire hat on, and I'll conclude with this, on J. Lee and Padilla and essentially ineffective assistance of counsel claims tied to bad advice to plead guilty where the result is a total deprivation of a trial. Not just a sentencing hearing, but a trial. A trial in everything that follows. That's not this case. And the last point is this. Because this is not a case of affirmative misadvice, Chaidez kills the ineffective assistance of counsel claim because the advice he is contesting was delivered before Padilla announced its new rule. And unless the court has any other questions, I'll rest on my brief and ask that the court affirm the judgment below denying coram nobis relief. We understand, certainly from Supreme Court teaching and other sources, that the root of coram nobis has a long lineage that reaches back to the common law of England. And that's, in fact, the term, the common law. But is your understanding of coram nobis that it is essentially equitable in nature? Do you know? Well, its origins, I mean, given the hard distinction between the, I don't actually know if the writ actually originated, say, in the Chancery Courts in England or originated in the King's Courts. But stepping back from there, it certainly sounds equitable to some degree. But it is an extraordinarily strict test. Indeed it is. But it has occurred to me that if it's history and if it continues to be in its continuing life as part of the Orr-Ritz Act, something that is equitable in nature, then that may open it up to concern to factual matters that might be at least less weighty or not even applicable if we were in a more rigid common law-based remedial structure. Well, in that regard, I would, and I know this Court is well aware of this, and is as fierce a defender of the separation of powers as any court possibly could be. But to the extent we're talking about factual circumstances that make Mr. Ragbir worthy of relief from the consequences of his conviction, the Constitution vests in the President and the President alone the right, the power, to pardon. And so to the extent that a quorum nobis test coming out of English common law might give to judges the ability to take into consideration those kinds of superriding equities in determining whether or not to relieve somebody from the consequences of a conviction, we have a system in our Constitution for that. That's application for pardon, which Mr. Ragbir has done. And that application is still pending. Actually, my rumination ought to suggest that those equitable factors could possibly work both ways. Well, they do. Well, in taking a step back, and again, going back to what we know from Third Circuit law and the Supreme Court, one of the factors to consider is prejudice to the government, and we're dealing now with a trial that occurred in 2000, prejudice to the government. And a hearing that took place just last year in which trial counsel indicates, in part, I don't have a specific recollection of what exactly was said to Mr. Ragbir, that testimony taking place 18 years after the trial. There is that. And so the fading of recollection is understandable given how much time has passed. And the events at issue, of course, were even earlier. They were in the mid to late 90s. And so that's baked into the test itself. What are the consequences? Well, this at least gives me an excuse to dig out Blackstone. Thank you very much. Thank you, Your Honor. And again, thank you for being here. May it please the Court. My name is Danielle Rivas, and I'm here for Mr. Rabideau-Florence Ragbir. I'd like to address a couple of the issues that the government makes. And I'd like to start with the fact that quorum nobis has been applied to sentencing in the Fifth Circuit, in the Ninth Circuit, in the Second Circuit, and in the Third Circuit in the case of Orocio. And quorum nobis is particularly important in the deportation context because, as is the fact that there is no statute of limitations for quorum nobis, because deportation consequences are limitless, and they extend into the future as long as the future goes on and as long as that threat is open. And it is important for those petitioners to have this possibility be viable. The government also asserts that misadvice was allowed at the time of Mr. Ragbir's trial, and that is not the case. In the case of Myers v. Gillis, which is a pair of companion cases from the Third Circuit that came down in 96 and 98, which can be found at, the latest of which can be found at 142 F3D664, the court there found that counsel had the duty, if they were to advise their clients on matters, even collateral matters, they had the duty to be accurate. Doesn't that cut against your delay point? If this was a point of law that was established in the 90s, before any of the later cases were decided, it seems that there's even less basis for delay because you weren't waiting for new law to be developed by the Supreme Court or the circuit. So if that's really the case, that may help at one level, but doesn't it really undermine the delay point? Because if this was the law beforehand, then there was even less basis for delaying. To that point, specifically within the ineffective assistance of counsel, I would point to a case that attorney Coyne recently submitted, Kimmelman, which found that when a delay is a result of ineffective assistance of counsel, the responsibility should be imputed to the state. And this is because it can take a lot of time for a lay person to realize what went wrong, and if we put ourselves in Mr. Rodbeer's position, even if he understood in 2006 that it was the loss issue that was the problem, understanding the significance of a FADAGO hearing is really becoming a lot more difficult. Let's just say it should be imputed to the state. For how long? After someone gets a new counsel? After they specifically retain counsel to address quorum nobis concerns? Is it imputed to the state indefinitely? No, Your Honor. I'd like to point back to the basic standard of sound reasons, which is reasonable diligence, which Mr. Rodbeer has amply fulfilled. And as soon as the BIA in 2012 told him and his immigration counsel that they should turn their efforts to the federal courts, they submitted their petition for quorum nobis. Mr. Rodbeer can also cite to intervening case law with regards to his jury instruction claims. That didn't come down until 2010 and 2011. And I'd like to also point back to the case of Cariola, which states that if there is a fundamental violation of a constitutional right, then the mere passage of time should not be enough. And I'm so sorry I say that my time is up. If I could make one more point? Okay. I feel – Before you go on to that point, and again, what – I mean, we have jury instructions that had some defects even conceded by the government, individually, not holistically. But what's the fundamental constitutional violation here? The fundamental constitutional violation, which is, to be clear, what the majority in Stoneman held in contrast to the concurrence opinion in Stoneman, is that it is a fundamental violation if the jury was allowed to convict someone for non-criminal conduct. And in Mr. Rodbeer's case, there are two sets of – But your colleague conceded, as I thought she had to, that you're not trying to get a new trial here. You're not challenging the conviction. You're challenging the sentencing. So that means the conviction stands as valid. It's not a fundamental error in the conviction. There has to be some fundamental constitutional error in the sentencing proceeding, no? At the base level, with regards to the ineffective assistance of counsel claim, the most basic thing we would ask for is a new FATICO hearing, but also a retrial or resentencing with the jury instructions in mind would be something else that we would pose to the court. So you want the retrial, but your co-counsel doesn't want a retrial. We are not saying that the jury instructions are off the table. What my co-counsel was saying was that ineffective assistance of counsel, that claim requires a new FATICO hearing. And if I could just tidy up with the jury instructions, the two fundamental errors there were that the willful blindness diminished the mens rea and allowed the jury to convict him without establishing that he had knowledge or intent to commit fraud. And the scheme or artifice to defraud, which Justice Scalia in his concurrence and skilling said was so vague that it violated the due process clause, stretched out the definition of fraud so that the jury couldn't understand it and didn't make out for criminal conduct. And this, in Mr. Radbeer's situation, allowed the jury to convict him for essentially being a pawn in another common scheme. Thank you. If there's no further questions. Thank you very much. I'm not sure what the applicability is of skillings and honest services fraud is to this case, but we've heard your argument. We've heard all the arguments, and we thank all of counsel for a very good briefing and for excellent arguments today in a case that I know is of importance, not just to Mr. Radbeer, but also of importance jurisprudentially to many and to this court. It will be an interesting matter to pursue, and we'll take the matter under advisement and thank all of counsel asking the clerk to adjourn the proceedings. The younger guys get out of here quickly. It's us old guys who take a while. Have a good day, Judge.